### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 08-10-P-H** |
| | ) | |
| **DAN DOODY,** | ) | |
| | ) | |
| **Defendant** | ) | |

### RECOMMENDED DECISION ON MOTION TO SUPPRESS

Dan Doody, charged by indictment with possession of a firearm by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(1), Indictment (Docket No. 3), moves to suppress any statement made by him to law enforcement officers on October 25, 2006, any evidence obtained on that date, and any evidence obtained as a result of "both the South Portland Police Department's and the Drug Enforcement Administration's respective unreasonable stops of" him.  Defendant's Motion to Suppress (Docket No. 19) at 1.

An evidentiary hearing was held before me on July 29, 2008, at which the defendant appeared with counsel.  Three exhibits were offered by the government and admitted, one over objection.  Two exhibits were offered by the defendant and admitted without objection.  Three witnesses testified for the government and three for the defendant, including the defendant himself.[1]  I now recommend that the following findings of fact be adopted, and that the motion be denied.

---

[1] The defendant also recalled one of the government's witnesses, Michael Grasso, in the defendant's presentation of evidence.

### I. Proposed Findings of Fact

Michael Grasso, a special agent with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") for almost seven years, received a telephone call on October 24, 2006, from Paul Wolf, a special agent with the federal Drug Enforcement Administration ("DEA"). Wolf informed Grasso of information he had developed indicating that a convicted felon, Jose Sotomayor, had stored two firearms (a Russian Izhmash rifle and a handgun) in a black Acura at 24 Wermuth Street in South Portland, Maine. That address is in the Red Bank Village complex. Erik Larsen, an 8-year officer with the South Portland Police Department ("SPPD") then assigned to the Maine Drug Enforcement Agency ("MDEA"), had located the black Acura on October 24, 2006, and learned that it was registered to the defendant. He passed this information along to Wolf.

The next day, Grasso and Wolf interviewed Leslie Fenton at her residence in Portland, Maine, about the convicted felon, Jose Sotomayor. That morning, Larsen and another agent knocked on the front door of 24 Wermuth Street. As they were waiting for a response, Ruth McVane arrived and asked them who they were. The agents identified themselves and told her that they were looking for the defendant. She told them that she was the defendant's mother. She also knocked on the door, but no one answered. The agents left.

Also on October 25, 2006, Wolf and Grasso went to 24 Wermuth Street to see the black Acura. Surveillance had been established by another agency at that address in an attempt to locate the defendant in order to talk to him about the guns. Surveillance was also taking place at a nearby address with respect to Sotomayor. The SPPD and the MDEA were involved in both surveillances. Beginning around 10 a.m., Wolf and Grasso left 24 Wermuth Street and returned several times. The defendant was inside an apartment at 24 Wermuth Street. The apartment was

rented in the name of Rachel Farrington, his former girlfriend, who had left a few weeks earlier to live with her parents after having surgery. The defendant received a telephone call informing him that people were watching the building. He thought that he should leave, and he and a friend exited the apartment and drove off in the friend's red pickup truck, driven by the friend.

Wolf and Grasso recognized the defendant from a photograph as he left 24 Wermuth Street. They had been informed that the defendant was subject to a condition of bail that allowed random searches of his person, vehicle, and residence. Government Exhibit 1 is a copy of the bail bond including those conditions signed by the defendant in Maine District Court on October 24, 2006.[2] The officers had also been informed that the defendant might be a prohibited person, that is, that he could not possess firearms due to a previous felony conviction. At the direction of Larsen, uniformed SPPD officers in two marked cruisers pulled over the red pickup truck less than a mile from 24 Wermuth Street. The stop occurred shortly after 5 p.m.

A uniformed SPPD officer told the defendant that he was not under arrest but that she was putting handcuffs on him as standard procedure while he was transported back to 24 Wermuth Street, where he was needed. He was taken back to his apartment in the back of that officer's cruiser. The handcuffs were removed upon arrival at 24 Wermuth Street. Larsen met with the defendant in Larsen's car. Larsen sat in the driver's seat while the defendant sat in the front passenger seat. Larsen advised the defendant of his *Miranda*[3] rights, reading from a card that he carried with him. He asked the defendant, who had previously been convicted of burglary, whether he understood each section of the warning as he read it from the card, and the defendant in each instance said that he did. The defendant said that he wanted to waive his rights and speak with Larsen. Larsen showed the defendant a copy of his bail conditions allowing

---

[2] The defendant had been arrested for operating a friend's Ford Explorer without a license. When he was stopped, he gave a false name to the police. He put his mother's address on the bail bond because he received mail there.
[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

random searches of his person, car, and residence.  He told the defendant that he was not under arrest but that the agents needed him there during the search of his Acura.  After 10 to 15 minutes, Grasso got into the back seat of Larsen's car.

The defendant was cooperative but nervous while he was in Larsen's car.  Grasso and Larsen were both in plain clothes.  Larsen told the defendant that the officers were looking for firearms that they believed were stored in his car and that he had been returned to 24 Wermuth Street so that he could be present while the black Acura was searched.  The defendant confirmed that the Acura was his but not that the firearms were in it.  Larsen told the defendant that the basis for the search was the condition of his bail.  The defendant made one or more calls on his cell phone to try to locate the keys to the Acura.  He did not have a driver's license and had been loaning the car to friends.  The defendant was polite and cooperative but reluctant to talk at first. He asked Larsen and Grasso for assurances that he would not get into trouble with respect to the firearms if he was cooperative.  Both Larsen and Grasso told the defendant that they could not make any promises.

Shortly after Grasso had joined the conversation in Larsen's car, all three men got out of the car.  Larsen left to join the Sotomayor surveillance.  Grasso invited the defendant to speak further with him in the car that belonged to Malcolm Van Alstyne, a special agent with ATF who had arrived at 24 Wermuth Street around 5 p.m.  The defendant accepted the invitation and sat in the front passenger seat, Grasso sat in the driver's seat, and Van Alstyne sat in the back seat. Grasso told the defendant that he was free to go and did not have to talk with them.  The defendant said that he was willing to speak with the agents but asked for assurances that he would not get into trouble because he was a convicted felon.  The defendant said more than once that he wanted to help the agents.  The agents told him that they could not make any promises.

4

During this conversation, the defendant developed a bloody nose.[4]  Van Alstyne handed the defendant a napkin, telling him in a joking fashion not to get blood on the floor of his car.  As keys were not located, the trunk of the Acura was eventually "popped," but no firearms were found in the car.  While speaking with Grasso and Van Alstyne, the defendant said several times that the firearms were not in the apartment.  Eventually, he admitted that the rifle was in the spare bedroom of the apartment at 24 Wermuth Street, that it belonged to Sotomayor, and that it had been there for two days.  The conversation in Van Alstyne's car lasted from 30 to 45 minutes.

The defendant told the agents that the apartment was leased in the name of Rachel Farrington, his former girlfriend, that he had been living there "most of the time" since moving his clothes there in August 2006, and that Farrington had not been staying there in recent weeks. He also said that he did not have the keys to the apartment, which was locked.  The defendant gave the officers the number of Rachel Farrington's cell phone, and one of the agents called her.[5] Farrington was at work at the time and did not answer a number of calls.  When she did eventually answer, the agent told her to come to 24 Wermuth Street.  She responded that she could not leave her work, where she was bathing a mentally challenged elderly client of her employer, Port Resources.  The officer told her that it was important that she come to the apartment, and that the matter was very serious.  Farrington became very upset.  She called the defendant's mother, Ruth McVane, who obtained from Farrington the name of the agent who had called, and called the SPPD in an attempt to verify that it employed an officer by that name.  She was told that the SPPD had no such officer.  McVane then called the telephone number that the agent had given Farrington.  The person who answered told McVane that he was one of the

---

[4] The defendant testified that he was prone to bloody noses.
[5] The uncontroverted testimony was that neither Van Alstyne nor Grasso made the call to Farrington.

agents she had encountered that morning and assured her that a marked police cruiser would be at 24 Wermuth Street when Farrington arrived to corroborate that Farrington was needed on police business.

Farrington made arrangements with her employer so that she could leave, and a co-worker drove her to McVane's house.  McVane then drove Farrington to 24 Wermuth Street. They arrived no more than an hour after Farrington had been called at work.  The defendant told Grasso and Van Alstyne that he did not want to speak to Farrington or his mother.  He stayed in Van Alstyne's car while Grasso, Wolf, and Dave Brown, who was then the resident agent in charge of the ATF in Maine, approached McVane's car, which had stopped near an SPPD cruiser.  After Farrington got out of the car, the agents started to walk away with her but McVane protested.  She was very upset.  Brown tried to calm her down and took her aside.  Soon thereafter McVane was directed to move her car some distance away from 24 Wermuth Street, where she parked and waited for Farrington.

Farrington was also upset but cooperative.  Grasso told her about the search for the firearms and asked for her consent to search the apartment for the firearms.  He told her that, if she did not consent, the agents would apply for a search warrant, and Farrington would have to wait along with them while that process ran its course.  Farrington signed the consent-to-search form; she testified that she was not forced to do so.  She then told the agents that she did not have a key for the apartment, but she told them how to get in through an open window.  Agent Pelletier of MDEA entered the apartment in that manner and let the others in through the door. Farrington was placed in the kitchen of the apartment with the defendant, who was again handcuffed, while the search of the apartment took place.  After the rifle was found where the

defendant had said it would be, Farrington was told that she could leave, and she returned to McVane's car.

The defendant was told that the rifle had been found and that he was free to go.  He was not arrested that day.  The rifle was found at approximately 7 p.m.

As many as 10 agents and police officers might have been at 24 Wermuth Street at any given time on October 25, 2006.  There were several unmarked vehicles parked around the building and at least one SPPD marked cruiser.

## II. Discussion

Counsel for the government and counsel for the defendant agreed during the oral argument that followed the evidentiary hearing that two issues are presented by the defendant's motion: (1) whether the defendant was given the necessary *Miranda* warning before he told the agents where the rifle was located and (2) whether Farrington gave valid consent to a search of the apartment for the rifle.[6]  I need only consider the first issue, for the reasons that follow.

"*Miranda* established a baseline rule, now determined to be of constitutional dimension, as to certain warnings which must be given before a suspect's custodial statements may be admitted into evidence."  *United States v. Bezanson-Perkins*, 390 F.3d 34, 39 (1st Cir. 2004).  In this case, the government argues that the defendant was not in custody on October 25, 2006, at any time that he made any statements that might be used as evidence against him.  The defendant argues that he was in custody and, in fact, under arrest, from the moment he was handcuffed during the traffic stop of the red pickup truck.  I need not resolve this dispute, because, assuming *arguendo* that the defendant was in custody at all relevant times, I credit Larsen's testimony that he read the full *Miranda* warnings to the defendant from his card and obtained the defendant's

---

[6] This agreement waives the arguments made by counsel for the defendant in the motion itself with respect to the stop of the red pickup truck and probable cause to arrest the defendant at the time of the stop, if indeed he was arrested at that time.  Defendant's Motion to Dismiss (Docket No. 19) at 1-3.

acknowledgement that he understood the rights conveyed, before the defendant said anything that might otherwise be subject to suppression or lead to the suppression of evidence as "fruit of the poisonous tree." *See United States v. Stark*, 499 F.3d 72, 76 (1st Cir. 2007).

By the time that the defendant got into Larsen's car, Larsen knew that the defendant was suspected of storing or hiding a Russian rifle for its owner, who was a convicted felon. Those circumstances could have given rise to criminal charges against the defendant, whether or not the defendant was himself a convicted felon. It makes sense that, under these circumstances, Larsen, who then had 8 years of experience as a police officer, would read the defendant his *Miranda* rights before asking him where the rifle was. Larsen certainly had no information that suggested that the defendant was *not* a convicted felon.

To the extent that the defendant means to argue that his statement about the location of the rifle was nonetheless coerced, even if he had been given a proper *Miranda* warning, there is no evidence to support that conclusion. A showing of coercive police tactics sufficient to render a defendant's statements inadmissible requires a threat of violence or serious retaliation, prolonged questioning, or an oppressive atmosphere. *See United States v. Byram*, 145 F.3d 405, 407-08 (1st Cir. 1998). Here, the defendant testified that some officers, but not the three agents who testified, yelled and screamed at him after the trunk of the Acura was opened and no firearms were found. These unidentified officers told him that he would be in a lot less trouble if he told them where the gun was, and, according to the defendant, these officers told him not to look at Farrington when she arrived on the scene. He also testified that the officers were "playing good cop, bad cop" with him and moved him to a total of three different vehicles while questioning him. None of this establishes that the defendant's statement that the gun was in a bedroom in the apartment was coerced.

8

To the contrary, the defendant was familiar with criminal procedure, having previously been convicted of burglary. When stopped while driving a friend's vehicle without a license the day before the events at issue here, he had given the police a false name. He was able to negotiate with Larsen, Grasso, and Van Alstyne for a period from 30 to 45 minutes in an attempt to obtain some benefit from telling the agents where the gun was. By his own admission, he lied repeatedly to the agents during that period by saying that he did not know where the gun was. And, he admitted at the hearing that he knew at the time what his *Miranda* rights were. These actions by the defendant were hardly those of a coerced individual; rather, they were the actions of an individual well-versed in the criminal process, seeking to take control of the situation in which he found himself.

Once the defendant told the agents that one of the firearms that they were looking for was in the apartment, they did not need consent to search the apartment for the gun. The defendant had already told the agents that he was living in the apartment, and the terms of his bail bond, which he had signed the previous day, required him to "submit to . . . searches of my person, vehicle and residence at any time and without probable cause [with respect to the bond's prohibition of possession of any dangerous weapons including but not limited to firearms]." Government Exh. 1. The agents knew at that point that the apartment was the defendant's residence and that he had possessed a dangerous weapon which was then in the apartment. They did not need the defendant's consent, or that of Farrington, in order to enter the apartment at that point. What they did need was access to the locked apartment, which neither the defendant nor, ultimately, Farrington could provide through the use of keys. Farrington told the agents how to get into the apartment through an open window, but that information merely hastened the agents' access to the apartment. Providing that information was not an act of consent, because no

consent was required.  The fact that the agents asked Farrington to give written consent when none was needed does not require that the written consent be examined for its legal validity.

### III.  Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact herein be adopted and that the motion to suppress be **DENIED**.


### _NOTICE_

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which _de novo_ review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to _de novo_ review by the district court and to appeal the district court's order.*


Dated this 6th day of August, 2008.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge